IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISION

| | | |
|---|---|---|
| METRO EQUIPMENT & RENTAL CO., INC., | § § | |
| *Plaintiff*, | § § | |
| **v.** | § § | PE:21-CV-00030-DC-DF |
| TSURUMI MANUFACTURING CO., LTD., and DAISHIN INDUSTRIES, LTD., | § § § | |
| *Defendants*. | § | |

<u>REPORT AND RECOMMENDATION OF THE U.S. MAGISTRATE JUDGE</u>

TO THE HONORABLE DAVID COUNTS, U.S. DISTRICT JUDGE:

BEFORE THE COURT is Defendant Daishin Industries, Ltd.'s ("Daishin") Rule 12(b)(2) Motion to Dismiss Plaintiff's First Amended Complaint for Lack of Personal Jurisdiction (hereafter, "Motion to Dismiss"). (Doc. 13). This matter is before the undersigned United States Magistrate Judge through a standing order of referral pursuant to 28 U.S.C. § 636 and Appendix C of the Local Court Rules for the Assignment of Duties to United States Magistrate Judges. After due consideration, the undersigned **RECOMMENDS** that Daishin's Motion to Dismiss be **DENIED**. (Doc. 13).

## I. BACKGROUND

This case's genesis is an indemnity claim concerning an underlying state lawsuit brought by an injured driver. On May 6, 2019, an individual named Camilo Salcedo ("Salcedo") was allegedly working at a saltwater disposal site in Pecos County, Texas, when an explosion suddenly broke out and severely injured him, purportedly due to a faulty oil pump at the site. (Doc. 13-2 at 6–7). On October 22, 2021, Salcedo filed a Fourth Amended Petition in state court under Cause No. 2020-20371, *Camilo Salcedo v. HAWG SWD, LLC, et al.*, in the 151st District Court of Harris County, Texas ("State Court Action"), against a multitude of defendants. (Doc. 13-2). Four of these defendants in the State Court Action are Tsurumi (America), Inc. ("Tsurumi America"); Metro

Equipment & Rental Co., Inc. ("Metro Equipment"); Tsurumi Manufacturing Co., Ltd. ("Tsurumi Japan"); and Daishin. *Id.* Salcedo brings his claims for personal injury under the theories of breach of warranties, products liability, and negligence. *See id.* at 9–13. Salcedo asserts that "the pump involved in the underlying incident was designed, manufactured, sold, and distributed" by Tsurumi America, Tsurumi Japan, Daishin, and Metro Equipment. *Id.* at 9.

Metro Equipment filed its Original Complaint in on May 5, 2021, invoking this Court's diversity jurisdiction under 28 U.S.C. § 1332(a). (Doc. 1 at 2). Metro Equipment filed its First Amended Complaint (hereafter, "Amended Complaint") against Tsurumi Japan and Daishin on November 23, 2021. (Doc. 11). Metro Equipment seeks a judgment requiring Tsurumi Japan and Daishin to indemnify it against Salcedo's claims in the State Court Action. *Id.* at 8. Metro Equipment maintains that it was as an innocent retailer for the pump, entitling it to indemnification for products liability under Texas state law against Daishin and Tsurumi Japan, the pump's purported manufacturer and distributor, respectively. *Id.* at 1, 4; *see* TEX. CIV. PRAC. & REM. § 82.002. Thus, Metro Equipment requests that the Court require Tsurumi Japan and Daishin to fully indemnify it for the injuries Salcedo sustained due to the faulty pump.

On December 7, 2021, Daishin filed the instant Motion to Dismiss.[1] (Doc. 13). In its motion, Daishin argues that, noting that it is a Japanese-based company, this Court possesses neither general nor specific personal jurisdiction over it, as "any alleged act complained of by Salcedo and Metro Equipment would have occurred in Japan." *Id.* at 3. In essence, Daishin propounds that the business transactions which eventually led to the Metro Equipment's selling the subject trash pump to Salcedo's employer in West Texas constitute insufficient minimum contacts. *Id.* On December 23, 2021, Metro Equipment filed its Response, arguing that Daishin failed to base its Motion to Dismiss on the proper minimum contacts framework for products liability, and instead claims that, under the

---

1. Daishin's first motion to dismiss for lack of personal jurisdiction was rendered moot by Metro Equipment's Amended Complaint. (Docs. 9, 11).

proper analysis, it was "foreseeable" that the pump could end up in Texas. (Doc. 16 at 2). Metro Equipment prays, in the alternative, that the Court allow limited jurisdictional discovery to utilize deposition testimony from the State Court Action if the Court determines it is warranted, which Daishin does not oppose. *Id.* at 18; (Doc. 17 at 10). Daishin filed a Reply on January 14, 2022, and following Court approval, Metro Equipment produced a Surreply on February 18, 2022. (Doc. 29). This matter is now ripe for disposition.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) permits a court to dismiss claims against a defendant who is not subject to the court's personal jurisdiction. A federal court sitting in diversity under 28 U.S.C. § 1332(a) may exercise jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over the defendant, and (2) the exercise of personal jurisdiction conforms with the due process guarantees of the United States Constitution. *See Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 869 (5th Cir. 2000). The Texas long-arm statute extends jurisdiction "as far as the federal constitutional requirements of due process will permit." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002) (quoting *U-Anchor Advert., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)). Consequently, federal courts sitting in Texas need only consider the second step of the analysis. *See Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 220 (5th Cir. 2012).

"The Due Process Clause of the Fourteenth Amendment guarantees that no federal court may assume jurisdiction *in personam* of a non-resident defendant unless the defendant has meaningful 'contacts, ties, or relations' with the forum state." *Luv n' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). Due process requires a federal court to refrain from exercising jurisdiction over a nonresident defendant unless the following two-prong test is satisfied: "(1) the nonresident must have minimum contacts with the forum state, and (2) subjecting the nonresident to jurisdiction must be consistent with traditional

3

notions of fair play and substantial justice." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004) (internal quotation marks omitted).

If a plaintiff makes out a prima facie case that the nonresident defendant has minimum contacts with the forum, the burden shifts to the nonresident defendant to demonstrate that exercising personal jurisdiction would offend traditional notions of fair play and substantial justice. *See Luv n' Care Ltd.*, 438 F.3d at 473. To determine whether the exercise of personal jurisdiction would be unfair or unreasonable, courts balance the following factors: "(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies." *E. Concrete Materials, Inc. v. ACE Am. Ins. Co.*, 948 F.3d 289, 298 (5th Cir. 2020) (quoting *Luv n' care*, 438 F.3d at 473).

### III. DISCUSSION

The undisputed[2] factual assertions are as follows. Daishin manufactured the relevant pump ("Subject Trash Pump") in Japan. (Docs. 13 at 2; 16 at 5). Daishin sold the Subject Trash Pump to Tsurumi Japan, which it then distributed via its wholly owned subsidiary Tsurumi America to the United States. (Docs. 13 at 3; 16 at 5). Tsurumi America sold the Subject Trash Pump to Metro Equipment in Texas, which then sold it to Salcedo's employer. (Docs. 13 at 3; 16 at 4). Salcedo claims in the State Court Action that a fire near the Subject Trash Pump caused him severe burns. (Docs. 13 at 7; 16 at 4).

In its Motion to Dismiss, Daishin asserts that this Court lacks both general personal jurisdiction as well as specific personal jurisdiction over Daishin, since any alleged act would have

---

2. The undersigned distinguishes "undisputed" from "uncontroverted." "Undisputed" refers to those facts either on which Daishin and Metro Equipment appear to have reached a consensus by the face of their pleadings, or the veracity of which has otherwise not been challenged. "Uncontroverted," on the other hand, entails those facts asserted in Metro Equipment's Amended Complaint and which have been opposed, but not sufficiently controverted by Daishin. *See Duke Energy Int'l, L.L.C. v. Napoli*, 748 F. Supp. 2d 656, 678 (S.D. Tex. 2010).

occurred in Japan and not the United States, let alone Texas. (Doc. 13 at 3). Regarding general personal jurisdiction, Daishin claims that it is incorporated in Japan, has its headquarters in the country, and does not own property or have employees or a registered agent in Texas, and therefore is not "at home" in Texas, or even the United States. *Id.* at 10–11. Daishin argues against specific personal jurisdiction on the bases that the conduct alleged occurred only in Japan, and that Metro Equipment's causes of action are based only on the "fortuitous chance" that the Subject Trash Pump would "end up" in Texas. *Id.* at 12–13. Daishin claims that Metro Equipment's Amended Complaint lacks sufficient factual allegations to show that Daishin otherwise expected or should have foreseen that the Subject Trash Pump would be purchased and used in Texas. *Id.* at 13.

Metro Equipment responds to Daishin's disclaimer of specific personal jurisdiction by referring to a website allegedly operated by Daishin, in which Daishin admits that "certain products meet the United States' Underwriters Laboratory ("UL") safety certification." (Doc. 16 at 6). Metro Equipment also asserts that Daishin's distribution network provides a sufficient contact through Tsurumi Japan's own United States-based subsidiary as to make it foreseeable that the Subject Trash Pump could end up in Texas. *Id.* at 7–8. Metro Equipment lastly points to Daishin's decades-long history of selling the Subject Trash Pumps in such a manner as to be sold in Texas, not only by Metro Equipment, but by other Texas retailers. *Id.* at 8–9.

The questions before the Court are therefore: (1) what is the appropriate minimum contacts standard for products liability actions in the Fifth Circuit? (2) under this standard, does the undisputed relation between Tsurumi Japan and Tsurumi America subject Daishin to the Court's specific personal jurisdiction? (3) if Metro Equipment's Amended Complaint lacks sufficient jurisdictional facts, should the Court grant jurisdictional discovery?

### A. *Personal Jurisdiction*

"The 'minimum contacts' prong is further subdivided into contacts that give rise to specific jurisdiction and those that give rise to general jurisdiction." *Freudensprung*, 379 F.3d at 343. When

the cause of action either arises from or is directly related to the nonresident defendant's contacts with the forum state, there is specific personal jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984); *see also Freudensprung*, 379 F.3d at 343. In contrast, when the nonresident defendant's contacts with the forum state are unrelated to the plaintiff's cause of action but are, instead, "continuous and systematic," there is general personal jurisdiction. *Helicopteros*, 466 U.S. at 414 n. 9; *see also Freudensprung*, 379 F.3d at 343. In any event, "the defendant's contacts must be more than random, fortuitous, or attenuated, or of the unilateral activity of another party or third person." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521, 548 (5th Cir. 2014) (quoting *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013)) (alteration omitted).

Metro Equipment has confirmed that it is only advancing its indemnity action against Daishin on a theory of specific personal jurisdiction. (Doc. 16 at 10 ("Personal jurisdiction can be general or specific. Metro Equipment argues only the latter.")). It therefore appears to be conceded that the Court does not possess general personal jurisdiction over Daishin. Accordingly, the undersigned need not evaluate whether general personal jurisdiction exists, and will proceed to discuss the viability of maintaining this suit against Daishin only on specific personal jurisdiction grounds.

    B.  *Minimum Contacts*

        a.  *Stream of Commerce Theory*

At this juncture, it is most appropriate to address the jurisprudential elephant in the room. Metro Equipment and Daishin seem to disagree as to whether there is a specialized standard for determining the existence of minimum contacts in a products liability action. Daishin argues that the unpublished Fifth Circuit case of *Zoch v. Magna Seating* is instructive, which purportedly stands for the principle that a manufacturer's knowledge that a product "would be used and sold in the United States . . . *might* lead to its products being sold in any of the 50 states" is insufficient to show that the manufacturer "placed the [product] into the stream of commerce with the expectation that the product

would be used by consumers in Texas." (Doc. 13 at 15 (citing *Zoch v. Magna Seating (Germany)*
*GmbH*, 810 F. App'x 285, 292–93 (5th Cir. 2020)) (internal quotation marks omitted). Daishin
expends a significant portion of its Motion to Dismiss attempting to synthesize the instant fact pattern
with that of *Zoch*, advancing the position that Metro Equipment's lawsuit should be dismissed
against it accordingly. *Id.* at 15–17.

Metro Equipment, on the other hand, argues that *Zoch* is distinguishable, and that other
federal courts in Texas have held as such. (Doc. 16 at 11–12). Metro Equipment cites the cases of
*Thiam v. T-Mobile USA, Inc.*, and *Nestle USA, Inc. v. Ultra Distribuciones Mundiales S.A. DE C.V.*,
for the claim that Daishin's reliance on *Zoch* is "misplaced." *Id.* at 16; *see Thiam v. T-Mobile USA,*
*Inc.*, No. 4:19-CV-00633, 2021 U.S. Dist. LEXIS 75157, 2021 WL 1550814 (E.D. Tex. Apr. 20,
2021); *Nestle USA, Inc. v. Ultra Distribuciones Mundiales S.A. DE C.V.*, 516 F. Supp. 3d 633 (W.D.
Tex. Feb. 1, 2021). Finally, Metro Equipment contends that, even if the Court were to find *Zoch* to be
controlling, *Zoch* "does not alter the [preexisting minimum contacts] analysis," and further that the
instant case involves highly distinct facts. (Doc. 16 at 17–18).

The undersigned agrees with Metro Equipment's formulation of the appropriate standard for
minimum contacts in a products liability action. The "stream of commerce" doctrine of
demonstrating minimum contacts in the products liability context is applied where "the product has
traveled through an extensive chain of distribution before reaching the ultimate consumer."
*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 926 (2011). The doctrine
originated in *Asahi Metal Industry Co., Ltd. v. Superior Court of California. See Seagen Inc. v.*
*Daiichi Sankyo Co.*, 546 F. Supp. 3d 515, 526 (E.D. Tex. 2021) (citing *Asahi Metal*, 480 U.S. 102
(1987)). Justice O'Connor, who delivered the judgment of the divided Court, described the Due
Process Clause as requiring "something more" than the defendant's awareness that its product
"ent[ered] into the forum State through the stream of commerce." *Asahi Metal*, 480 U.S. 111–16
(O'Connor, J.) (plurality op.).

7

Four other Justices, led by Justice Brennan, understood that no such "additional conduct" beyond the defendant's awareness that the product "is being marketed in the forum State" is necessary to demonstrate that, from the defendant's perspective, "the possibility of a lawsuit [in the forum State] [does] []not come as a surprise." *Id.* at 117 (Brennan, J., concurring). Thus, with a plurality, no decisive test for the stream of commerce's imputation of personal jurisdiction was declared. A short stint again with a split Supreme Court in *J. McIntyre Machinery, Ltd. v. Nicastro* revealed that the Court might be inclined to constrain personal jurisdiction to "only where the defendant can be said to have targeted the forum." 564 U.S. 873, 882 (2011); 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1067.4 (4th ed. 2022). To date, "neither opinion [from either Justice O'Connor or Justice Brennan] has carried a majority." *Seagen*, 546 F. Supp. 3d at 527 (citing *Nicastro*, 564 U.S. 873 (2011)).

As formulated by the United States Court of Appeals for the Fifth Circuit in its modern form, the doctrine nevertheless "recognizes that a defendant may . . . subject itself to personal jurisdiction [] by sending its goods rather than its agents into the forum." *In re DePuy Orthopaedics, Inc.*, 888 F.3d 753, 778 (5th Cir. 2018). Elsewhere, the Fifth Circuit has declared that the minimum contacts requirement is satisfied where "the defendant delivered the product into the stream of commerce with *the expectation that it would be purchased by or used by* consumers in the forum state." *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013) (emphasis added).

*Ainsworth* marked the beginning of the Fifth Circuit's more recent journey into the stream of commerce enigma. 716 F.3d 174 (5th Cir. 2013). In that case, an Irish manufacturer had sold allegedly defective forklifts exclusively to a third-party American distributor, some of which ended up in Mississippi. *Id.* at 176. The manufacturer had made no attempt to geographically limit where the party sold, marketed, or distributed the forklifts. *Id.* at 177. The manufacturer filed an initial motion to dismiss based on a lack of personal jurisdiction, which the underlying district court had denied. *Id.* at 176. Following the Supreme Court's *Nicastro* decision, the manufacturer requested that

8

the district court reconsider its prior ruling on the motion to dismiss, which was subsequently denied again due to the plurality holding in *Nicastro*. *Id.* at 176.

On appeal to the Fifth Circuit, the manufacturer characterized *Nicastro* as eliminating the Fifth Circuit's stream-of-commerce framework. *Id.* at 178. Upon hearing this argument, the Fifth Circuit did not recoil. The Fifth Circuit emphasized that, because the plurality's position in *Nicastro* that personal jurisdiction cannot be maintained solely on the fact that "the defendant might have predicted that its goods will reach the forum State" required the defendant to "have targeted the forum," the stream-of-commerce test was surely "in tension." *Id.* (citing 564 U.S. at 882). Guiding the lower courts away from the ostensibly false shepherd of *Nicastro*, the court explained that the Irish manufacturer had provided more than just a "single, or even a few, isolated sales" to the American distributor which were eventually sold to Mississippi customers, amounting to just over 200 forklifts. *Id.* at 178, 179. Further, the manufacturer's forklifts, used for Mississippi poultry production, accounted for 1.55% of its American sales during the relevant period. *Id.* at 179. The court concluded that, even if the manufacturer was not specifically aware of the American third-party distributor's sales in Mississippi, "it reasonably could have expected that such sales would be made, given the fact that Mississippi is the fourth largest poultry-producing state in the United States." *Id.* Thus, the Fifth Circuit affirmed personal jurisdiction over the foreign manufacturer, effectively gilding the stream-of-commerce analysis in an array of perennial light.

In sum, a court can exercise specific personal jurisdiction over a defendant "if the defendant's product made its way into the forum state while still in the stream of commerce" and the defendant possessed even "mere foreseeability or awareness" of this possibility. *Id.* at 177; *see Dillard v. Fed. Corp.*, 321 F. Supp. 3d 752, 756 (W.D. Tex. 2018) (citing *Ainsworth*, 716 F.3d at 177). Although this test, affirmed by the Fifth Circuit even after *Nicastro*, "was in tension with the plurality opinion" by its virtue of "not requiring that the defendant target the forum," the Fifth Circuit nevertheless held that its "pre-[*Nicastro*] stream-of-commerce holdings were not abrogated."

*Ainsworth*, 716 F.3d at 178. Therefore, the undersigned chooses to follow the most contemporaneous and more comprehensive version of the stream of commerce doctrine as promulgated by the Fifth Circuit, and will not endorse Justice O'Connor's "something more" approach at this time. *See Dillard*, 321 F. Supp. 3d at 757 (applying "the looser, []stream-of-commerce/awareness test from Justice Brennan's opinion in *Asahi* and Fifth Circuit precedent"); *accord Oehring v. Spike Brewing, LLC*, No. 6:19-cv-00444-ADA, 2020 U.S. Dist. LEXIS 98096, at *11 n.3, 2020 WL 3001052, at *3 n.3 (W.D. Tex. June 4, 2020) (rejecting the contention that "there must be 'something more' such as 'special state-related design, advertising, advice, marketing or anything else' to show that Clampco availed itself to the privilege of conducting activities in Texas"). Accordingly, contrary to Daishin's formulation, the mere fact that the "acts occurred in Japan" does not circumvent this Court's jurisdiction, for this extra-territorial quality is inherent in the minimum contacts inquiry in the products liability context. (Docs. 13, 17, 29); *see Ainsworth*, 716 F.3d at 178–79.

   *b.* Zoch *and its Progeny*

   With the Fifth Circuit having upheld the stream-of-commerce approach, effectively isolating *Nicastro* as a non-starter, it seemed that, absent a further Supreme Court majority holding to the contrary, the specific personal jurisdiction status quo was to be maintained. However, the Fifth Circuit ultimately confronted the issue again in *Zoch*. 810 F. App'x 285 (5th Cir. 2020). *Zoch* involved a products liability suit on behalf of a decedent plaintiff who had purchased a Smart Fortwo ("Fortwo") automobile and shortly thereafter died in an automobile collision. *Id.* at 286. The plaintiff was rear-ended while driving in an ordinary, non-injurious accident; however, the driver's seat anchor allegedly malfunctioned, causing the seat to collapse "rear-ward" and "inboard" during the accident, which propelled the plaintiff backward and sending him to collide his head with the rear of the Fortwo's interior. *Id.*

   Plaintiff's Fortwo was designed by German company Daimler AG, and manufactured in France from component parts. *Id.* Another German component company manufactured the metal and

structural components of the Fortwo's seats, which were later sold and supplied to Magna Seating (Germany) GmbH ("Magna"). *Id.* Magna assembled the Fortwo's seats, "after which it sold and furnished the finished seats to Daimler's [] Fortwo assembly plant in France." *Id.* These Fortwos were distributed across the globe, including to Smart USA Distributor LLC, "the general importer of Smart vehicles to the United States." *Id.* This distributor sold the specific Fortwo to a Mercedes-Benz dealership in Texas, before selling the vehicle to a private individual; the Fortwo was later traded-in to a Toyota dealership elsewhere in Texas, from which the plaintiff made his purchase.

In setting the backdrop for the opinion, the Fifth Circuit discussed the *Nicastro* split and how "Justice Breyer's concurrence illuminated the outer limits of [the Fifth Circuit's] 'foreseeability' test." *Id.* at 290. In *Nicastro*, Justice Breyer had foreseen that a test based upon a defendant's awareness "that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states" would grant federal courts in each State jurisdiction over a products-liability suit "against any . . . manufacturer who sells its products (made anywhere in the United States) to a national distributor, no matter how large or small the manufacturer, no matter how distant the forum, and no matter how few the number of items that end up in the particular forum at issue." *Nicastro*, 564 U.S. at 891 (emphasis in original).

With these observations in mind, the Fifth Circuit turned to the question of whether Magna "could have reasonably expected that its product would be sold or used in Texas." *Zoch*, 810 F. App'x at 291. In making its determination that Magna was only aware that the relevant seats "would be placed in vehicle ultimately destined for the *United States* generally, not *Texas* specifically," the Fifth Circuit considered a multitude of factors. *Id.* at 292. However, the court noted that, "[i]mportantly," the plaintiff "ha[d] not provided, and conceded at oral argument that he does not have, any evidence that Magna was aware that any of its seats manufactured for the . . . Fortwo would likely end up in Texas." *Id.* Further, the Court found that the arguments presented by the plaintiff distinguished the case from prior precedent, noting that the plaintiff did not advance the

11

claim that "the forum state was unique in its [automobile product market]," which should be "a form of commerce[] . . . not immensely prevalent among citizens of each of the fifty states," which would impute a greater knowledge to Magna than that the Fortwo "*might* lead to those products being sold in any of the fifty states." *Id.* at 292 (citing *Nicastro*, 564 U.S. at 890–91 (Breyer, J., concurring)) (emphasis in original) (internal quotation marks omitted).

Before concluding that the federal district court lacked personal jurisdiction over Magna, the Fifth Circuit opined that "the number of . . . Fortwos actually sold in Texas" might allow a court to "infer Magna's knowledge of the likely number of its seats that would end up in that state," or that the components supplier "hav[ing] an exclusive contract with the distributor . . . [or] control over . . . the sales or marketing of the final product" could lead a court to deduce Magna's requisite awareness. *Id.* at 292–93 (citing *Ainsworth*, 716 F.3d at 177) (emphasis omitted). Addressing the plaintiff's last vestige of jurisdiction, the Fifth Circuit finally rejected as unreasonably broad the argument that Texas's population, which thereby "command[ed] a large portion of the automobile market," imbued upon the district court jurisdiction. *Id.* at 293. In sum, it appeared that the Fifth Circuit was beginning to endorse the "something more" approach envisioned by Justice O'Connor in *Asahi Metal*. *See* WRIGHT & MILLER, *supra*, § 1067.4 (4th ed. 2022).

Since *Zoch*, district courts have begun to frame the inquiry of stream of commerce jurisdiction by contradistinguishing *Zoch*, *Ainsworth*, or sometimes both. *See, e.g.*, *Rawls v. Old Republic Gen. Ins. Grp., Inc.*, 489 F. Supp. 3d 646, 664 (S.D. Tex. 2020) (initially finding that "the instant situation to be more akin to *Zoch* than *Ainsworth*," but later exclaiming that the case presented a "crucial distinction from both *Ainsworth* and *Zoch*"). In *Thiam v. T-Mobile USA, Inc.*, for example, the District Judge Amos L. Mazzant for the Eastern District of Texas considered whether it was able to exercise personal jurisdiction over Korean manufacturer LG Chem, LTD ("LGC"), which had manufactured and sold an allegedly defective cellphone battery to T-Mobile, eventually purchased by the plaintiff at a Texas distributor. No. 4:19-CV-00633, 2021 U.S. Dist. LEXIS 75157, at *1–2, 2021

WL 1550814, at *1 (E.D. Tex. Apr. 20, 2021). The court found that personal jurisdiction did exist. First, the court explained that LGC's sales being exclusively extra-Texan, or even extra-American, "is not determinative." *Id.*, 2021 U.S. Dist. LEXIS 75157, at *10, 2021 WL 1550814, at *4. The court then construed the stream of commerce awareness principle somewhat broadly, noting that the profound sophistication and largesse of LGC imputed to LGC the ability to "recognize" that the United States and Texas would be the final destination of some shipments of the companies to which LGC sold its batteries. *Id.*, 2021 U.S. Dist. LEXIS 75157, at *10–11, 2021 WL 1550814, at *4.

In finding that *Zoch* was not instructive, Judge Mazzant acknowledged that *Zoch* "is not binding on th[e] [c]ourt," given its unpublished status. *Id.*, 2021 U.S. Dist. LEXIS 75157, at *11–12, 2021 WL 1550814, at *4 (citing 5th Cir. R. 47.5). Judge Mazzant continued to explain how *Zoch* was did not apply: the *Thiam* plaintiff "provided [the court with proof of] the number of [phones with the LGC battery] that were sold in Texas," and that LGC batteries were "being sold in Texas" by two Texas distributors. *Id.*, 2021 U.S. Dist. LEXIS 75157, at *12–13, 2021 WL 1550814, at *5. *Zoch*, on the other hand, as Judge Mazzant noted, instead involved a plaintiff who failed at all to demonstrate the number of defective vehicles sold in Texas. *Id.*, 2021 U.S. Dist. LEXIS 75157, at *12, 2021 WL 1550814, at *5.

*Nestle USA, Inc. v. Ultra Distribuciones Mundiales S.A. de C.V.* was the Western District of Texas's foray into the *Zoch* conundrum. 516 F. Supp. 3d 633 (W.D. Tex. 2021). There, the plaintiffs were wholly owned subsidiaries of Nestle, S.A., and the defendants were a Mexico-based distributor of Mexican products, including those Nestle products "intended for sale only in Mexico," named Ultra Distribuciones Mundiales S.A. de C.V. ("Ultra Mundiales"), as well as a Texas-based subsidiary of Ultra Mundiales. *Id.* at 640. The plaintiffs had brought suit for various trademark and business tort claims. *Id.* at 641. In arguing for dismissal for lack of specific personal jurisdiction, Ultra Mundiales contended that, according to *Zoch*, the stream of commerce doctrine was inapplicable. *Id.* at 643.

13

The Senior District Judge David Alan Ezra held that it possessed specific personal jurisdiction over Ultra Mundiales even though it "never sold products in Texas." *Id.* at 644. Specifically, Judge Ezra was influenced by the facts that Ultra Mundiales had transferred several products to its Texas subsidiary, and that Ultra Mundiales shared some of its leadership with the subsidiary. *Id.* at 644–45. More importantly, however, was the assertion that the Nestle Mexico products, as "targeted for Hispanic consumers, would likely be sold in Texas," since the state "has one of the largest Hispanic origin populations of any [American] state." *Id.* at 644. The Judge Ezra admonished *Zoch*'s limiting tenets, noting that the plaintiffs did not merely rely on the virtue of Texas's large population, and, unlike the *Zoch* plaintiff, the *Nestle* plaintiffs presented evidence of Ultra Mundiales's knowledge that its products would end up in Texas. *Id.* at 645.

c.   *Controverted Allegations Analysis*

Before entering into a substantive analysis, a more preliminary discussion is in order. The parties dispute whether Metro Equipment's jurisdictional allegations have been sufficiently controverted by Daishin's Motion to Dismiss. (Docs. 13 at 7; 16 at 12–13). When a nonresident defendant requests a dismissal under Federal Rule 12(b)(2), the plaintiff bears the burden to demonstrate the existence of personal jurisdiction. *See Nagravision SA v. Gotech Int'l Tech. Ltd.*, 882 F.3d 494, 498 (5th Cir. 2018). When a court rules on the issue without a full evidentiary hearing, a plaintiff need only make a prima facie showing of jurisdiction. *See Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994). Additionally, a court will take the allegations of the complaint as true, except where they are controverted by opposing affidavits, and all factual conflicts are resolved in favor of the plaintiff. *See Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 592 (5th Cir. 1999).

However, a court is not restricted to a review of the complaint alone but may also consider the contents of the record at the time a Federal Rule 12(b)(2) motion is made. *See Sangha v. Navig8 Ship Mgmt. Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018). Furthermore, a court need not "credit conclusory allegations, even if uncontroverted." *Panda Brandywine Corp. v. Potomac Elec. Power*

*Co.*, 253 F.3d 865, 869 (5th Cir. 2001). In sum, to decide whether a prima facie case exists, a court is to accept as true the plaintiff's "uncontroverted allegations . . . and resolve in its favor all conflict between the facts *contained in the parties' affidavits and other documentation*." *FTC v. Educare Ctr. Servs.*, 414 F. Supp. 3d 960, 967 (W.D. Tex. 2019) (emphasis added) (citing *Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010)).[3]

      Daishin's Motion to Dismiss is accompanied by one unsworn declaration. (*See* Doc. 13-3). If this sole unsworn declaration is indeed considered an "affidavit,"[4] the undersigned finds that it does not adequately controvert any of the facts alleged by Metro Equipment which would be relevant to the stream of commerce theory. (Doc. 13-3). As noted above and will discussed below in detail, specific personal jurisdiction engendered by the stream-of-commerce inquiry does not require a defendant's physical presence in the forum State, nor does it mandate direct sales, marketing, or manufacturing in said state. *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Yet, the declaration provided

---

3. Daishin refers to Metro Equipment's allegations concerning this Court's jurisdiction as "conclusory." (Doc. 13 at 4). Further, Daishin characterizes the causes of action before the Court as "not aris[ing] out of, or relat[ing] to, any purported contacts Daishin had with the State of Texas." (Doc. 17 at 6). In response, Metro Equipment claims that its jurisdictional allegations do indeed contain accompanying factual allegations pertaining to Daishin's sophistication, repeated third-party sales in Texas, and knowledge of Tsurumi Japan's distribution scheme. (Doc. 16 at 12 n.42). Metro Equipment also defends by stating that the Daishin's Texas contacts, if established, are the base of the current indemnity action. (Doc. 29 at 1–2). Metro Equipment is correct in both regards. Even a cursory observation of the Amended Complaint reveals that it is replete with factual allegations concerning Tsurumi Japan's distribution system, as well as Daishin's involvement with and subsequent contacts through its manufacturing and sales agreement. (Doc. 11 at 1–8). Moreover, Metro Equipment expressly notes in its Amended Complaint that "[t]he causes of action . . . arise from [Daishin's] contacts" with Texas through Tsurumi Japan and Tsurumi America. *Id.* at 3, 5.

4. The keyword here in this case is "affidavit," one of which Metro Equipment argues Daishin has failed to provide in order to successfully controvert Metro Equipment's jurisdictional allegations. (Doc. 16 at 12–13). Metro Equipment opposes in a tangential footnote Daishin's unsworn declaration based upon a provision of the United States Code purportedly requiring an international declarant to state that the information was supplied "under penalty of perjury under the laws of the United States of America that the foregoing is true and correct." *Id.* at 13 n.46 (citing 28 U.S.C. § 1746) (emphasis omitted). This argument, as advanced, is without fruit. Metro Equipment has not provided any authority interpreting or applying § 1746 to an unsworn declaration signed abroad, let alone in the jurisdictional controversy context. To the contrary, the undersigned has detected at least one instance in which an unsworn declaration's substantial compliance with § 1746 allowed a court to properly consider it where the declarant attests that "the foregoing statements made by me are true and offered subject to penalty and perjury under the law." *Herbert v. Pouya*, No. 2:20-CV-1413-NR, 2021 U.S. Dist. LEXIS 83859, at *12, 2021 WL 1737463, at *4 (W.D. Pa. May 3, 2021) (internal quotation marks omitted). Daishin's declarant includes two statements indicating that "[e]very statement made in this [d]eclaration is made on my personal knowledge and is true and correct," and also that, "under penalty of perjury[,] . . . the foregoing is true and correct." (Doc. 13-3 at 1, 2). Therefore, to the extent this argument should be evaluated, it should be rejected accordingly.

by Daishin is almost entirely compromised of claims relating to Daishin's *own* presence or activities

within Texas itself, from Daishin's lack of bank accounts, registered agents, offices, employees,

sales, or marketing in Texas. (*See generally* Doc. 13-3).

   This is the ultimate red herring. There exist no assertions which would contradict or

otherwise conflict with the relevant jurisdictional allegations as propounded by Metro Equipment,

namely being that Daishin has knowledge or should have been aware of the fact that the Subject

Trash Pumps would be sold in Texas, whether by Tsurumi Japan directly or through another third

party. *See Wartsila N. Am., Inc. v. Int'l Ctr. for Disp. Resol.*, 387 F. Supp. 3d 715, 731 (S.D. Tex.

2018) (discussing a defendant's failure to controvert the pertinent facts for general personal

jurisdiction).[5] If anything, the declaration implicitly supports Metro Equipment's assertions: Daishin

only provided the trash pumps to Tsurumi Japan, which Daishin admits is the company which "sells

[the] trash pumps to Tsurumi [America]"; additionally, Daishin and Tsurumi Japan operate pursuant

to a business contract, which the undersigned interprets as an exclusivity agreement given Tsurumi

Japan's exclusive purchaser status. (Doc. 13-3 at 1, 2). Therefore, the undersigned finds that Daishin

has not adequately controverted Metro Equipment's factual allegations. Accordingly, the Court

should take Metro Equipment's jurisdictional allegations as true, and deny the Motion to Dismiss on

this ground alone.

   Metro Equipment instead has submitted an affidavit countering Daishin's Motion to Dismiss

and substantiating its claims that "Metro Equipment sold 56 Tsurumi-branded . . . pumps[, and]

either sold or rented over 100 Tsurumi-branded . . . pumps." (Doc. 16-1 at 3). Metro Equipment

further supports its assertions in the Amended Complaint that Metro Equipment specifically chose

---

5. Daishin cites *Ford Motor Co. v. Montana Eighth Judicial District Court* for the premise that personal jurisdiction cannot be established over Daishin "based solely on the conduct and contacts of third parties." (Doc. 17 at 3 (citing *Ford Motor*, 141 S. Ct. 1017, 1022, 1025 (2021)). *Ford Motor* certainly provides a concise summary of the case law and jurisprudence on specific personal jurisdiction. However, *Ford Motor* is factually distinct from the instant case, and is therefore not applicable. *See Thiam v. T-Mobile USA, Inc.*, No. 4:19-CV-00633, 2021 U.S. Dist. LEXIS 75157, at *9 n.1, 2021 WL 1550814, at *4 n.1 (E.D. Tex. Apr. 20, 2021).

the Daishin-manufactured Subject Trash Pump as a result of their immediate availability in Texas. *Id.*; (Doc. 16 at 8). As noted, Daishin has failed to controvert these factual allegations supporting Metro Equipment's claim of jurisdiction in this Court. Thus, the undersigned need not resolve any factual conflict at this stage of the litigation. Even if Daishin's "evidence" were sufficient to controvert Metro Equipment's allegations, because as detailed below Metro Equipment has already made its prima facie case, Daishin cannot get this case dismissed "simply by controverting the facts established." *FTC v. Educare Ctr. Servs.*, 414 F. Supp. 3d 960, 980 (W.D. Tex. 2019) (citing *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 245 (5th Cir. 2008)).

Daishin has failed on multiple grounds to controvert Metro Equipment's jurisdictional allegations. Therefore, said allegations should be taken as true, and specific personal jurisdiction exacted. Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **DENIED**. (Doc. 13).

> ### d.  *Evidentiary Analysis*

In the event that the Court does not consider Metro Equipment's jurisdictional allegations to be without dispute, the undersigned still finds that any such conflict should be resolved in Metro Equipment's favor. Thus, Metro Equipment will have met its burden of alleging facts sufficient to demonstrate Daishin possessed minimum contacts with Texas to warrant the Court's exercise of specific personal jurisdiction if it can be inferred from the Amended Complaint and supporting evidence that Daishin knew or should have known that the Subject Trash Pump would be sold in Texas.

The undersigned concludes that Metro Equipment has sufficiently demonstrated Daishin's alleged conduct constitutes minimum contacts. Following the Fifth Circuit's own guidance that the inquiry must be "fact-intensive and case-specific," the issues presented here are readily distinguishable from *Zoch*, and are instead reminiscent of *Ainsworth*. *In re Toyota Hybrid Brake*

*Litig.*, No. 4:20-CV-127, 2021 U.S. Dist. LEXIS 124918, at *24, 2021 WL 2805455, at *9 (E.D. Tex. July 6, 2021) (citing *Zoch*, 810 F. App'x at 293).

The facts presented here, and supported by evidence, demonstrate that it was reasonably foreseeable that the Subject Trash Pump would end up in Texas. Metro Equipment has asserted—and Daishin has admitted—that Daishin provided these trash pumps to Tsurumi Japan. (Docs. 16 at 2; 17 at 7). That the sales between Daishin and Tsurumi Japan took place in Japan is not itself determinative. *Nestle USA, Inc. v. Ultra Distribuciones Mundiales S.A. DE C.V.*, 516 F. Supp. 3d 633, 644 (W.D. Tex. Feb. 1, 2021) (citing *Ainsworth*, 716 F.3d at 177). Additionally, according to Metro Equipment, from 2010 to 2019, Metro Equipment itself sold 56 Subject Trash Pumps as manufactured by Daishin and branded by Tsurumi Japan, "including the pump that [] Salcedo claims caused his injuries" in the State Court Action. (Doc. 16-1 at 3). Metro Equipment further insists that it "purchased and either sold or rented over 100 Tsurumi-branded [Subject Trash P]umps" in Texas starting in or around 2010. *Id.* After a shift in the supply chain of comparable trash pumps in or around 2010, Metro Equipment evidently found it fiscally prudent to utilize the Subject Trash Pumps as manufactured by Daishin due to the presence of Tsurumi America warehouses in Texas. *Id.* As the Fifth Circuit explained concerning the 203 forklifts in *Ainsworth* delivered to Mississippi customers via a third party, the 100-plus Subject Trash Pumps being sold in Texas through Tsurumi America or Metro Equipment are a "far cry from the single sale" in *Nicastro*. *Ainsworth*, 716 F.3d at 178.[6]

Daishin and Tsurumi Japan, as Daishin concedes in the Motion to Dismiss, conduct their business concerning the Subject Trash Pump pursuant to an exclusivity contract, under which Tsurumi Japan is the only recipient of the Subject Trash Pump. (Doc. 13-3 at 1–2). Daishin has exclaimed that the Subject Trash Pump is made exclusively for and in accordance with Tsurumi Japan's specifications. (Docs. 13 at 4 n.3, 13; 13-3 at 1). Moreover, Daishin's declaration and Motion

6. This very calculus was envisioned by the *Zoch* court itself. *See Zoch*, 810 F. App'x at 292.

18

to Dismiss inadvertently support Metro Equipment's assertion that Daishin is aware that Tsurumi Japan sells trash pumps to Tsurumi America. (Docs. 13-3 at 2; 13 at 15 ("Daishin probably aware that Tsurumi Japan may sell some of the Tsurumi Trash Pumps to Tsurumi America . . . .")). Metro Equipment has buttressed this argument even more, with screenshots from websites presumably operated by Tsurumi America showing a "remote warehouse" in northeastern Texas and a "distributor" in El Paso, Texas. (Docs. 16-12 at 2; 16-13 at 2).

If it is true that Tsurumi America is a wholly-owned subsidiary of Tsurumi Japan—which Metro Equipment has been asserted and Daishin has not controverted—and Daishin provides its Subject Trash Pumps to Tsurumi Japan, it is not at all inconceivable, and perhaps rather apprehensible, that Daishin's pumps would be distributed by Tsurumi Japan in the United States via its subsidiary based in the country. *See Nestle*, 516 F. Supp. 3d at 645–46 (holding that the sale of the foreign company's products to its Texas subsidiary signified minimum contacts). Tsurumi Japan undisputedly distributes equipment for oil facilities and companies in America, either on its own or through its subsidiary. (Docs. 13-3 at 2; 13 at 15). Daishin's "targeting" would have occurred as to Tsurumi Japan, a distributor of oil and gas equipment to the American market, given how its contractual agreement was admittedly "exclusive." (Doc. 13 at 2). That the subsidiary has a warehouse and a local distributor in Texas entirely cements this conclusion. Daishin's production agreement with Tsurumi Japan has not been alleged to have had a "clear geographical limit on [Tsurumi Japan's] sales network," and Daishin has accordingly provided the Court with little reason to refuse to exercise jurisdiction based on simple international geography. *See Rawls v. Old Republic Gen. Ins. Grp., Inc.*, 489 F. Supp. 3d 646, 665 (S.D. Tex. 2020).

The undersigned finds that it cannot be, as Daishin suggests, that a manufacturer of a faulty product categorically lies beyond the stream of commerce and is insulated by mere writ of its having utilized a distributor to which it sold the product. *See In re DePuy Orthopaedics, Inc.*, 888 F.3d 753, 781 (5th Cir. 2018). The Fifth Circuit found that, even aside from the colossal power Justice Breyer

cautioned against in *Nicastro*, "203 forklift sales in Mississippi over ten years . . . soundly established sufficient minimum contacts" for Mississippi federal courts. *Zoch*, 810 F. App'x at 292 (summarizing *Ainsworth*, 716 F.3d at 179). This was appropriate enough to allow for personal jurisdiction "notwithstanding that [the defendant] lacked actual knowledge of those sales" in Mississippi. *Id.* The undersigned further detects no reason as to why independent management between a manufacturer and first-level distributor would bequeath the former of any awareness of the final destination of its products.

Another point of concern for Daishin is the plain fact that Texas is one of the country's greatest oil exporters. *See Llog Expl. Co. v. Fed. Flange, Inc.*, No. 17-2323, 2019 U.S. Dist. LEXIS 145384, at *24–25, 2019 WL 4038599, at *8 (E.D. La. Aug. 27, 2019); *see also HEI Res., Inc. v. Venture Rsch. Inst.*, No. 3:09-cv-403-M, 2009 U.S. Dist. LEXIS 76572, at *15, 2009 WL 2634858, at *5 (N.D. Tex. Aug. 26, 2009) (observing that "much of the oil and gas industry is centered in Texas"). In particular, the Permian Basin, in which Midland, Texas, is located, is the "largest oil producing area in Texas." *John Crane Prod. Sols, Inc. v. R2R & D, LLC*, 861 F. Supp. 2d 792, 797 (N.D. Tex. 2012). The Subject Trash Pump was utilized for the purposes of transporting oil across the facility. (Docs. 11 at 6; 13-1 at 7). Much as in *Nestle* and *Ainsworth*, this backdrop should have led Daishin to consider that selling exclusively to a buyer which has direct distribution ties to the United States, ultimately leading to sales to third parties such as Metro Equipment, or even Tsurumi America, would occur given the disproportionately Texan use of the trash pump for oil and gas services. *See Nestle*, 516 F. Supp. 3d at 644–46.

To hold that a pump implemented in oil facilities would not offer a reasonably foreseeable possibility of ending up in the United States' largest oil-producing state is beyond credulity. *See Llog Expl. Co.*, 2019 U.S. Dist. LEXIS 145384, at *25, 2019 WL 4038599, at *9 (finding foreseeability given the forum state's "status as an oil-and-gas producing state"). To Daishin's chagrin, Daishin's own website despite the multitudinous products it offers and the website's focus on "HG Hard Gear,"

suggests it has a global reach and is a sophisticated components manufacturer. (*See* Doc. 16 at 5–7 (citing http://daishinltd.asia/hgdaishin/en/top/index.html)). This sophistication and worldwide network should impute in part to Daishin the reasonable expectation that the United States, being one of the world's largest consumers and producers of gasoline and oil, would indeed be a primary target of a company like Tsurumi Japan, which is so ingrained in the American market that it hosts its own established subsidiary there. *See Thiam v. T-Mobile USA, Inc.*, No. 4:19-CV-00633, 2021 U.S. Dist. LEXIS 75157, at *10–11, 2021 WL 1550814, at *4 (E.D. Tex. Apr. 20, 2021). With these sophistication and market-based considerations in mind, "the possibility of a lawsuit [in Texas] cannot come as a surprise." *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 117–18 (1987) (Brennan, J., concurring).

Concerning the websites Metro Equipment cites for Daishin's "admission" that it has knowledge of and intent to deliver through many a media the Subject Trash Pumps to the United States generally and Texas specifically, the undersigned observes that the websites in fact refer to a product known as the "HG Hard Gear," and not the Subject Trash Pump. (*See* Docs. 16-10 at 2; 13 at 4 n.3, n.4, 5). Further, the accompanying map of the "HG Hard Gear," while signifying distribution centers throughout the United States, does not appear to have Texas as a final destination, though this may only be a demonstrative of the breadth of Daishin's distribution of the HG Hard Gear. (*See* Doc. 16-10 at 2 (distribution termini apparently in Chicago, Los Angeles, etc.)). Personal jurisdiction in the products liability context should only be exercised based on Daishin's knowledge or expectation that a product which is the *subject of the litigation* would enter the forum State, not another object seemingly unrelated thereto. *Pederson v. Unilever N.V.*, No. SA-20-CV-20-XR, 2020 U.S. Dist. LEXIS 250231, at *6–7, 2020 WL 8408971, at *2–3 (W.D. Tex. Oct. 2, 2020) (distinguishing between two products, only one of which is the alleged anchor for personal jurisdiction). Thus, the HG Hard Gear advertisement is of no avail to Metro Equipment here.

However, the websites indicating more generally that Daishin, through Tsurumi Japan and Tsurumi America, has a *distribution network* opening the door for access to the United States does support the inference that Daishin is aware its products, including the Subject Trash Pump, would become available for sale in the United States. (Docs. 16-10 at 2; 16-11 at 2–3). The undersigned is not persuaded by Daishin's cries of obsolescence due to a "server issue at least 8 years ago," since Metro Equipment has submitted evidence that it has been purchasing the Daishin-produced and Tsurumi Japan-branded pumps since 2010, well before the purported "server issue." (Doc. 17 at 10). In sum, based upon the overwhelming amount of evidence and admissions, the undersigned infers that Daishin was or should have been aware or expected that its Subject Trash Pumps, made specifically for a single Japanese distributor in full and sole control of a subsidiary with a warehouse and distribution hub in Texas, would end up in the this State.

Even when considering both *Ainsworth*'s and *Zoch*'s apparently contradictory principles,[7] Daishin cannot find refuge in *Zoch*. Reminiscent of the cases in *Thiam* and *Nestle*, Daishin's reliance on *Zoch* is wholly misguided and half-baked. At the outset, the undersigned must reiterate the jurisprudential setting: Justice Breyer's concurrence in the fractured *Nicastro* opinion is controlling in the Fifth Circuit. *See Ainsworth*, 716 F.3d at 178 ("Justice Breyer's concurring opinion . . . furnished the narrowest grounds for the decision and controls here."). In contrast, the Fifth Circuit's decision to withhold the publication of *Zoch* and expressly admonish lower courts from viewing the case as setting a broad, hardline principle justifies the undersigned's departure from its narrow holding. *See Thiam*, 2021 U.S. Dist. LEXIS 75157, at *11–12, 2021 WL 1550814, at *4–5; *see*

---

7. Most notably, the Fifth Circuit expressly couched its holding that the "application of the stream-of-commerce theory [did] not result in a finding of minimum contacts" in the principle of idiosyncratic interpretation. *Zoch.* 810 F. App'x at 293. Inherently, the Fifth Circuit was certain to exclaim that the *Zoch* reading of the stream of commerce doctrine does not "prohibit[] the exercise of specific jurisdiction over all component parts manufacturers." *Id.* Thus, the Fifth Circuit affirmed that *Zoch* was "limited to the specific facts of this case," and that each determination of specific jurisdiction "should be determined on a case-by-case basis under the facts of each individual case." *Id.*

*Nestle USA, Inc. v. Ultra Distribuciones Mundiales S.A. DE C.V.*, 516 F. Supp. 3d 633, 645 (W.D. Tex. Feb. 1, 2021).

Unlike the plaintiff in *Zoch*, who admitted he did not possess any evidence of defendant Magna's knowledge of the chain of distribution, there is a plethora of evidence that Daishin should have expected its Subject Trash Pump to be sold in Texas. Further, Metro Equipment is not relying on a baseless overgeneralization that Texas's large population would inherently lead Daishin to contact Texas, which certainly would run afoul of the minimum contacts base standard in any event. *Zoch*, 810 F. App'x at 293. Rather, the undersigned recognizes that the oil production in Texas is so prevalent that it would be difficult to imagine a defective oil and gas facilities parts manufacturer being awestruck when a part is sold there. *Llog Expl. Co. v. Fed. Flange, Inc.*, No. 17-2323, 2019 U.S. Dist. LEXIS 145384, at *25, 2019 WL 4038599, at *8 (E.D. La. Aug. 27, 2019) (applying the same for Louisiana).

*Zoch*'s non-binding adjudicative dicta also appears to present a calculated constriction by the Fifth Circuit of its own opinion. Although, of course, Texas is not the only state in the Union to produce oil, its substantially disproportionate production relative to the rest of the country certainly classifies it as "unique in its [oil] production," and is otherwise "not immensely prevalent among citizens of each of the fifty states." *Zoch*, 810 F. App'x at 292. Lastly, even in *Zoch* did the Fifth Circuit envision the possibility of personal jurisdiction if the defendant manufacturer had an "exclusive . . . contract with the distributor," which clearly and indisputably is the case here. *Id.*; (*see* Docs. 13 at 2; 13-3 at 1).

Most notably, the Fifth Circuit expressly couched its holding that the "application of the stream-of-commerce theory [did] not result in a finding of minimum contacts" in the principle of idiosyncratic interpretation. *Zoch.* 810 F. App'x at 293. Inherently, the Fifth Circuit was certain to exclaim that the *Zoch* reading of the stream of commerce doctrine does not "prohibit[] the exercise of specific jurisdiction over all component parts manufacturers." *Id.* Thus, the Fifth Circuit affirmed

that *Zoch* was "limited to the specific facts of this case," and that each determination of specific jurisdiction "should be determined on a case-by-case basis under the facts of each individual case." *Id.*

In conclusion, Metro Equipment has satisfied its burden of supplying enough facts in its Amended Complaint which would allow the undersigned to infer that Daishin reasonably could have expected its Subject Trash Pump to be sold in Texas. With Metro Equipment having done so, the burden shifts to Daishin to argue that jurisdiction would still be unfair or unreasonable. However, Daishin has provided no argument as to any of the fairness factors. Therefore, the undersigned must conclude that Daishin has failed to meet its burden, and presumably, this Court's exercise of personal jurisdiction is fair and reasonable.

### C. *Jurisdictional Discovery*

Metro Equipment requests that, in the event that this Court would be inclined to grant the Motion to Dismiss based on Daishin's supposed lack of knowledge that the Subject Trash Pump would make its way to the Texas market, it should be given an opportunity to conduct limited jurisdictional discovery based upon those responses and documents already generated and received in the State Court Action. (Doc. 16 at 18–20). Daishin has preemptively withdrawn opposition to this request to the extent that the Court finds it warranted. (Doc. 17 at 10).

As set forth above, the undersigned recommends that the Court deny Daishin's Motion to Dismiss. Consequently, the undersigned finds that the Amended Complaint as well as the evidence submitted in support thereof allege sufficient facts for this Court to exercise specific personal jurisdiction over the claims asserted against Daishin. Therefore, there exists no need for the parties to conduct further jurisdictional discovery. Accordingly, the undersigned **RECOMMENDS** that Metro Equipment's request for jurisdictional discovery be **DENIED AS MOOT**. (Doc. 16 at 18–20).

## IV. RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** that Daishin's Motion to Dismiss be **DENIED**. (Doc. 13).

Further, the undersigned **RECOMMENDS** that Metro Equipment's request for jurisdictional discovery be **DENIED AS MOOT**. (Doc. 16 at 18–20).

SIGNED this 10th day of May, 2022.

DAVID B. FANNIN
UNITED STATES MAGISTRATE JUDGE

25

**INSTRUCTIONS FOR SERVICE AND RIGHT TO APPEAL/OBJECT**

In the event that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested. Pursuant to 28 U.S.C. § 636(b), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy unless the time period is modified by the District Judge. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made; the District Judge need not consider frivolous, conclusive, or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on the U.S. Magistrate Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the District Judge. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).